**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASCENCEA, L.L.C., successor in interest to Affiliated Mortgage Protection, L.L.C.<br><br>                                  Plaintiff,<br><br>v.<br><br>RANDALL J. ZISOOK, et al.<br><br>                                  Defendants. | Civ. No. 08-5339 (DRD)<br><br>**O P I N I O N** |

*Appearances by:*

KLAFTER & MASON, L.L.C.
by:    Gary L. Mason, Esq.
Manalapan Corporate Plaza
195 Route 9 South, Suite 204
Manalapan, New Jersey 07726

   *Attorney for Plaintiff*

THE LAW OFFICES OF STEPHEN ROGER BOSIN, ESQ.
by:    Stephen R. Bosin, Esq.
48 Drs. James Parker Boulevard
Red Bank, New Jersey 07701

   *Attorneys for Defendants*

**DEBEVOISE, Senior District Judge**

This matter concerns the enforcement of restrictive covenants in a series of employment and independent contractor agreements. Plaintiff, Ascencea, L.L.C. ("Ascencea"), instituted this action against former associates of Affiliated Mortgage Protection, L.L.C. ("Affiliated"), claiming that Defendants violated their confidentiality and non-compete agreements by leaving to work for a competing company, Peoples Protection Group, Inc. ("PPG"). Ascencea pleads that it is the successor in interest to Affiliated, and that Defendants Zisook and Seifert orchestrated a plan to recruit Affiliated's managers and sales force to work for PPG and steal Affiliated's confidential business information.

Presently before the court is Defendants Randall J. Zisook, Lori Zisook, People's Protection Group, Inc., United Home Protection, Inc., Maria Seifert, Eastern Seaboard, Inc., Daniel Zaborowski, and Michael Wsol's motion for summary judgment. For the reasons set forth below, Defendants' motion is GRANTED. Ascencea's Complaint is DISMISSED.

## I.  BACKGROUND

Ascencea is a company that markets mortgage protection insurance ("MPI"), a form of declining-benefit life insurance which pays off an insured's mortgage in full in the event he or she dies before the mortgage is fully paid. (Complaint ¶ 30).[1] Ascencea markets its services through "junk mail," sending specially designed advertisements called "lead letters" to large numbers of prospective purchasers. Id. at 33. Ascencea obtains its address lists from a variety of bulk mailing list vendors. Id. at 35. The "lead letter" advertisements direct recipients to contact Ascencea for more information about MPI. Id. at 34. All responses to Ascencea's advertisements are logged in a database and the "leads" are forwarded to regional managers who charge

---

[1] All references to Plaintiff's Complaint are to the Second Amended Complaint filed on 03/30/2009 (Doc. No. 52).

particular agents with closing sales from those leads. Id. The company conducts its business primarily through independent contractors operating in various territories throughout the United States. Id. at 31.

While MPI is a legal product, it is of dubious financial value to most mortgage holders. As such, sellers of MPI have often been criticized for employing misleading, predatory, or outright fraudulent tactics to make sales. These tactics are exacerbated by a crowded marketplace of MPI sellers competing over a limited number of customers who can be convinced to purchase the insurance.

Ascencea claims that its method of selecting useful leads from the large numbers of addresses available for sale is a sophisticated technique that took many years to develop. Id. at 35. Ascencea has also designed a training program and related materials to instruct its agents on how to close a sale more frequently. Id. at 38. Given the time, effort, and expense involved in developing its "leads" and "business practices," Ascencea considers both to be valuable trade secrets. Id. at 35. Concerned that its solicitation methods could be easily replicated, Ascencea requires its agents, managers, and consultants to execute confidentiality and non-compete agreements. Id. at 39.

Ascencea alleges that Defendants breached their non-compete agreements by, *inter alia*, soliciting Ascencea employees to leave the company, using Ascencea leads, marketing materials and other confidential information in their own solicitation, and otherwise competing against Ascencea in violation of their restrictive covenants. Id. at 70. Defendants vehemently dispute the validity of the contracts while denying that they stole anything from Ascencea. (Def. Br. 46). Defendants further argue that Ascencea should be barred from enforcing the non-compete agreements because it has engaged in a pattern of unethical conduct, including: violating

insurance solicitation regulations, ignoring or circumventing the orders of state insurance regulators, and filing false "Vector" reports on Defendants to damage their ability to sell insurance. Id. at 21-25.

There is one critical factual wrinkle. Ascencea has only been in existence[2] since March of 2007 (Def. Ex. 9), and each of the confidentiality and non-compete agreements entered into by Defendants predates Ascencea's formation. (Complaint Exs. A, C, D, E, F, G, O, P). Defendants actually contracted with Affiliated, a company in the same business as Ascencea that was partially owned by one of the principals of Ascencea. (Def. Ex. 6). As it seeks to enforce the Affiliated contracts, Ascencea pleads that it is the successor in interest to Affiliated. (Complaint ¶ 3). Specifically, Ascencea alleges that Matthew A. Goldberg, a former principal of Affilated, bought out his former partner before forming Ascencea. Id. However no merger agreement, stock purchase agreement, assignment of rights, or other evidence signifying transfer of all corporate assets and liabilities has been provided to the court. Indeed, Affilated, the counterparty to Defendants' contracts, is still registered as a separate corporation under the laws of New Jersey. (Def. Ex. 6).

Defendants consist of two groups: (1) former employees and agents of Affiliated and Ascencea, and (2) former employee spouses and businesses started by former employees after leaving Ascencea. Their individual circumstances are as follows.

Defendant Randall Zisook ("Zisook") was employed, first by Affiliated and then Ascencea, from January 20, 2003 until on or about November 16, 2007. (Complaint ¶ 4). Zisook began as an agent and was later promoted, first to district manager, then to regional manager, and

---

[2]    Ascencea claims that it is a New Jersey limited liability company. Complaint ¶ 2. However public records indicate that it is organized under the laws of Delaware and registered as a foreign limited corporation in New Jersey. This strange misstatement does not alter the Court's analysis.

4

then finally to national marketing director. Id. On July 28, 2005, Zisook entered into a written Employment Agreement ("Zisook Agreement") with Affiliated. The Zisook Agreement states, in pertinent part:

> 7.      Restrictive Covenants …
> (b) In consideration of Employer's offer of employment to Executive pursuant to, this Agreement, Executive agrees that he shall not for a period of twenty-four (24) consecutive months following the termination of Executive's employment with Employer for any reason whatsoever within the United States
>
> (i) directly or indirectly engage, participate or make any financial investment in or become employed by or render any services to or for any person or company in competition with the mortgage life insurance business conducted by Employer or any of its agencies, or any similar business (the "Business"), within any area in which Employer is doing business at such time (whether as an employee, independent contractor, five (5%) percent or greater owner, partner, lender, stockholder or otherwise);
>
> (ii) Hire or enter into an independent contractor relationship, either directly or indirectly, any employee, manager, agent or consultant of the Company, in any capacity whatsoever, nor attempt to induce any such employee, manager, agent or consultant of the Company, to cease his or her business relationship with the Company or induce any such person, past or present, to furnish the Executive with information regarding vendors, agents or agencies, marketing materials, issued or pending business or any of the Company's marketing or sales practices;
>
> (iii) directly or indirectly raid, entice, induce, solicit, canvass, or accept any business (of the type conducted by Employer) for any other person or company from any past, present or future (as defined below) agent, manager, consultant or customer of Employer with whom Executive had contact during his employment,
>
> (iv) directly or indirectly employ or attempt to employ, engage or assist anyone else in employing or engaging in any competing business any of Employer's managerial, executive or sales employees, agents or agencies; or encourage any of such individuals to terminate their relationship with Employer;
>
> (v) directly or indirectly request any present or future ("future," as used herein, shall mean at or prior to the time of termination of Executive's employment) entities with whom Employer has business relationships to curtail or cancel their business with Employer, or Mail any direct mail solicitations of a similar content to those used by the Company,
>
> (vi) use or copy any of the Employer's sales materials flip charts, presentations, vendors, data sources, information or any materials whatsoever which originated

> from Executive's association with the Employer whether or not such materials are of a proprietary nature,
>
> (vii) directly or indirectly authorize or assist other person or, company in taking any of the foregoing actions.
>
> Id.

Zisook passed away on September 9, 2010.

Defendant Lori Zisook appears to have been named in this case only because she is the wife of Randall Zisook. (Complaint ¶ 10). She has entered into no contracts with Affiliated or Ascencea, and no specific allegations are made about her conduct in Plaintiff's complaint, apart from a summary claim that she somehow "aided and abetted, facilitated, condoned, acquiesced in" and "assisted" her husband in breaching his non-compete several years ago. Id.

Defendant Maria Seifert worked as an independent contractor with Affiliated and Ascencea from December 2002 until March 26, 2008. Id. at 11. She entered into a written Consulting Agreement ("Seifert Agreement") with Affiliated on November 29, 2006. (Complaint Ex. C). The Seifert Agreement states, in pertinent part:

> 11. Non-Competition/Non-Solicitation Covenant...
>
> (b) Non-Competition. During the Term hereof, unless approved by Company in writing in advance, Consultant agrees that Consultant (a) shall not engage in the business of marketing, soliciting or selling mortgage or other related insurance products (the "Business") in the Territory, as defined in Section 4, directly or indirectly, for Consultant's benefit or the benefit of another, with, from or by rendering services to, any of Company's agents, brokers, consultants or customers.
>
> (c) Non-Solicitation. Consultant shall not, unless approved by Company in writing in advance, directly or indirectly (1) solicit, induce, suggest or instigate or otherwise cause or attempt to cause (1) any customer of Company to cease or refrain from doing business with or through Company (by changing, procuring the change of, or requesting that any customer change the designation of Company as· its agent of record or broker of record, or otherwise), (ii) any agent, broker or consultant or prospective agent, broker or consultant of Company to cease or refrain from doing business with or through Company, nor shall Consultant engage in any insurance business relationship with the Company's agents, brokers

> or consultants after the termination of this agreement or (iii) any insurance company to cease or refrain from doing business with or through Company (by changing, procuring the change of, or requesting a change in its designation of Company as its agent, or otherwise); or (2) hire, employ, engage or otherwise do business with, either directly or indirectly, any employee, agent or broker of the Company, in any capacity whatsoever, nor attempt to induce any employee, agent or broker of the Company to terminate an employment or business relationship with the company or have the agent or broker work for the benefit of a spouse, friend, agent, broker or employee of the manager.
>
> (d) Confidentiality. Under no circumstances and at no time, during or after the Term, unless approved by Company in writing in advance, shall Consultant, directly or indirectly, use for his own benefit or the benefit of another, disclose, divulge, render or offer any Confidential Information of Company. Consultant acknowledges that disclosure of any Confidential Information concerning the Company would materially adversely affect the Company's Business and operation and ability to compete.

<u>Id</u>.

Defendant Daniel Zaborowski was associated with Affiliated and then Ascencea from July 2006 until April of 2008, working as a district manager. (Complaint ¶ 21). Zaborowski entered into a district manager's consulting agreement ("Zaborowski Agreement") with Affiliated on February 4, 2005. (Complaint Ex. 5). The Zaborowski Agreement states, in pertinent part:

> 12.  Non-Competition Covenant
> (a)  Consultant acknowledges that during its relationship with the Company it will be privy to Confidential information and will be the beneficiary of knowledge and training gained as a result of its relationship with the Company. In consideration thereof, and in consideration of the Company entering this Agreement, Consultant agrees that so long as this Agreement is in effect, and for a period of twenty-four (24) consecutive calendar months thereafter, Consultant will not, either directly or indirectly, except with the prior written consent of the Company, do any of the following:
> (I)  Solicit work from or render services to, either directly or indirectly, for its own benefit or the benefit of another, any of the Company's agents, agencies, or clients for whom it has performed services on behalf of the Company;
> (II)  Hire, either directly or indirectly, any employee of the Company, in any capacity whatsoever, nor attempt to induce any employee of the company to leave the employ of the Company and induce any employee past or present to furnish the Consultant with information regarding venders, agents or agencies, marketing

7

> materials, issued or pending business or any of the Company's marketing or sales practices; or
> (III) Reproduce or copy any of the Company's lead materials. Mail any direct mail solicitations of a similar content to those used by the Company. Use or copy any of the Company's sales materials flip charts, presentations or any materials whatsoever which originated from Consultant's association with the Company whether or not such materials are of a proprietary nature.

Id.

Defendant Michael Wsol worked, first as a sales agent and then as a district manager for Affiliated and Ascencea between January 2003 and March 26, 2008. (Complaint ¶ 23). Wsol entered into a consulting agreement ("Wsol Agreement") with Affiliated on January 15, 2007. (Complaint Ex. O). The Wsol Agreement states in pertinent part:

> 12. Non-Competition Covenant
> (a) Consultant acknowledges that during its relationship with the Company it will be privy to Confidential information and will be the beneficiary of knowledge and training gained as a result of its relationship with the Company. In consideration thereof, and in consideration of the Company entering this Agreement, Consultant agrees that so long as this Agreement is in effect, and for a period of twenty-four (24) consecutive calendar months thereafter, Consultant will not, either directly or indirectly, except with the prior written consent of the Company, do any of the following:
> (I) Solicit work from or render services to, either directly or indirectly, for its own benefit or the benefit of another, any of the Company's agents, agencies, or clients for whom it has performed services on behalf of the Company;
> (II) Hire, either directly or indirectly, any employee of the Company, in any capacity whatsoever, nor attempt to induce any employee of the company to leave the employ of the Company and induce any employee past or present to furnish the Consultant with information regarding venders, agents or agencies, marketing materials, issued or pending business or any of the Company's marketing or sales practices; or
> (III) Reproduce or copy any of the Company's lead materials. Mail any direct mail solicitations of a similar content to those used by the Company. Use or copy any of the Company's sales materials flip charts, presentations or any materials whatsoever which originated from Consultant's association with the Company whether or not such materials are of a proprietary nature.

Id.

Defendants Peoples Protection Group ("PPG"), United Home Protection Inc. ("United Home"); and Eastern Seaboard, Inc. ("Eastern") are each companies that were owned and/or operated by Zisook or Seifert. They are not signatories to any agreement with Affiliated or Ascencea and are named in the complaint only as "vehicles" for the conduct of other Defendants.

On the basis of these facts, Defendants move for summary judgment.

## II.   DISCUSSION

### A.   Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Rule 56(a). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact and do not merely suggest "some metaphysical doubt as to the

material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

A party must support its assertions that a fact cannot be or is genuinely disputed "by (A) citing to particular parts of materials in the record…or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Rule 56(c)(1). If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may…(2) consider the fact undisputed for purposes of the motion…" Rule 56(e).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate.

Before turning to the merits of Plaintiff's claims, this Court will first examine the threshold question of whether Ascencea has the legal right to enforce contracts entered into between Defendants and Affiliated.

### B.     Ascencea's Rights to Enforce Affiliated Agreements

While acknowledging that it is not a party to the contracts with Defendants that are at issue in this case, Ascencea claims that it is still entitled to enforce them. Ascencea first argues that "[r]estrictive covenants in a contract between employer and employee are assignable as an

incident of the business," (Pl. Br. 8) and cites A. Fink & Sons v. Goldberg[3], and J.J. Renardo, Inc. v. Sims[4] in support. Ascencea further claims that the contracts were assigned from Affiliated to Ascencea "by operation of law as an incident of the business." Id. at 9.

While it is true that restrictive covenants can, under certain circumstances, be automatically assigned when a business is sold *in toto* to another, Plaintiff's argument misses the point. Ascencea has produced no evidence that it actually acquired the capital stock or business assets of Affiliated. Indeed, the language of the complaint, while tellingly cryptic, suggests that this is not the case, writing:

> Ascencea was created for the sole purpose of facilitating a stock purchase agreement by and between Affiliated's two (2) owners. Specifically, Matthew A. Goldberg ("Goldberg") bought out his former partner in Affiliated and is now the majority owner of Ascencea.
>
> Complaint ¶ 3.

Despite numerous warnings from both Defendants and the Court that the issue would be contested, Plaintiff has produced no details of this "stock purchase agreement" and cited no evidence in its papers of a merger, assignment, or sale of Affiliated to Ascencea.[5] From the description in the complaint, it would appear that Ascencea and Affiliated have at least one common individual shareholder, but that majority ownership of Affiliated was ultimately transferred to Matthew Goldberg, not Ascencea. If so, the restrictive covenants could not have been transferred to Ascencea by operation of law, as the business was never sold, merely replicated by a common owner under the auspices of a new legal entity.

---

[3]   101 N.J. Eq. 644, 647 (Ch. 1927).

[4]   312 N.J. Super. 195, 201 (Ch. Div. 1998)

[5]   Defendants have challenged Ascencea's legal authority to enforce the Affiliated contracts from the outset of this case. The continuing questions about Ascencea's status were specifically noted by this Court's during the preliminary injunction hearing and in its October 29, 2010 opinion. (Doc. No. 109).

This situation is much akin to that addressed in the recent <u>Woodbridge Medical Associates, P.A., v. Berkley</u>, No. L-9139-05, 2010 WL 2195760 (App. Div. June 3, 2010) decision. That case involved a dispute between two groups of doctors who had formerly practiced together. The plaintiff in <u>Woodbridge</u> was a professional association called Woodbridge Medical Associates ("WMA"), which sought to enforce the exclusivity and non-competition agreements that had been entered into between the <u>Woodbridge</u> defendants and Woodbridge Internal Medical Associates ("WIMA"), a similar professional organization organized and operated by the same individuals that made up WMA. There as here, there were allegations that the second organization was identical to the first in terms of business practice, assets, owners, and employees. Like Ascencea, WMA appeared to have been organized, in part, to avoid legal claims directed against a prior entity.

On review of a trial court order dismissing the action, the Appellate Division affirmed dismissal, writing that:

> First, there is no question that the evidence failed to demonstrate the restrictive covenants WIMA extracted from [Defendants] were actually transferred or assigned to WMA. And, because the record clearly demonstrates that WIMA continued to exist following the transfer of interests and the formation of WMA, the judge correctly rejected the contention that WMA had succeeded to those assets and liabilities of WIMA that were not actually transferred or assigned.

<u>Woodbridge</u> at *3.

In addition, the court held that as a matter of law, "WMA could not take those assets of WIMA that were of benefit, leave behind legitimate claims asserted or threatened against WIMA, and still maintain it either succeeded WIMA or merged with it." <u>Id</u>.

The facts of this case mandate the same result. Plaintiff has produced no evidence that the assets and legal rights of Affiliated were ever purchased by or assigned to Ascencea. What evidence exists suggests that significant mortgage liabilities remained with Affiliated after the

formation of Ascencea. Absent evidence of a merger, assignment, or sale of legal rights this Court cannot permit Ascencea to enforce the contracts at issue in this dispute. Ascencea argues that "[w]hether a company that assumes the business or assets of another also assumes it [sic] liabilities is determined by principles of successor liability." (Pl. Br. 10). But again, Ascencea correctly states the law while missing the point. Defendants are not challenging whether Ascencea has assumed the *liabilities* of Affiliated. Defendants are challenging whether Ascencea has assumed the *assets* of Affiliated, including the legal right to enforce its restrictive covenants. As a matter of law, Ascencea is more than welcome to take responsibility for the liabilities of whomever it likes. But if it wants to avail itself of the legal rights of a separate legal entity, it must demonstrate that those rights belong to it, either because of a sale, merger, assignment or other transfer. And it has categorically failed to do so.

Ascencea claims that this Court should apply the successor liability test set forth in Wilson v. Fare Well Corp., 140 N.J. Super. 476 (Law Div. 1976). However the express language of that decision states that the test applies only to "debts and liabilities" (i.e. bad things) rather than assets and legal rights (i.e. good things). Moreover, even a cursory inspection reveals that the prongs of this test become incoherent when applied to a claim over anything that a corporation would actually want. The Wilson court held that:

> It is the general rule that where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct, except where: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape liability for such debts. (citations omitted). A fifth exception, sometimes incorporated as an element of one of the above exceptions, is the absence of adequate consideration for the sale or transfer.

Wilson, 140 N.J. Super. at 484.

Clearly an "agrees to assume" standard is inappropriate as applied to assets or legal rights. Any party would "agree to assume" valuable property, particularly if it comes without any incumbent debts or obligations. And even if this test were adopted, Ascencea has pointed to no evidence that Affiliated "s[old] or otherwise transfer[ed] all its assets to" Ascencea.

Ascencea has no standing to advance the claims of Affiliated. Plaintiff's breach of contract claims against all Defendants are DISMISSED.[6] As the remaining claims in Plaintiff's complaint are merely adjuncts to Ascencea's contract claim, or they are requests for specific remedies for the alleged breach, they cannot survive without it. Ascencea has not attempted to defend those counts as separate claims nor has it spelled them out in detail. Thus, the court finds it unnecessary to analyze those claims separately. All remaining claims in Ascencea's complaint are DISMISSED.

### III.     CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. Plaintiff's complaint is DISMISSED.

s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: April 5, 2011

---

[6] Not all Defendants join in this motion for summary judgment. However as all claims brought by Ascencea seek to enforce rights properly held by Affiliated, this ruling will, for reasons of administrative simplicity and judicial economy, dispose of the entire complaint.